UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-20549-CR-LENARD

UNITED STATES OF AMERICA,

v.

PHILIP ESFORMES,
ODETTE BARCHA, and
ARNALDO CARMOUZE,

    Defendants.
_____/

## JOINT MOTION FOR IMMEDIATE INTERLOCUTORY
## SALE OF CARE FACILITIES

Phillip Esformes ("Esformes") and the Business Entities[1] (collectively, "Movants") join in this Motion and respectfully request the Court to order an immediate interlocutory sale of four skilled nursing facilities ("SNFs") (d/b/a Oceanside, Mercy, Harmony, and Fair Havens) and seven assisted living facilities (ALFs") (d/b/a/ Courtyard Manor, Flamingo, La Serena, South Hialeah Manor, Lauderhill, Eden Gardens, and North Miami Retirement Living). The four SNFs

---

[1] The Business Entities consist of 21 entities, including ADME Investment Partners Ltd., ADME Real Estate LLC, Sefardik Associates, LLC, Ayintove Associates, LLC, GBRE Associates LLC, Fair Havens Center, LLC, Fair Havens Real Estate LLC, Courtyard Manor Retirement Living, Inc., Courtyard Manor Retirement Investors Ltd., Flamingo Park Manor LLC, The Pointe Retirement Investors Ltd., La Hacienda Gardens LLC, Rainbow Retirement Investors Ltd., Lake Erswin LLC, Morsey LC, Lauderhill Manor LLC, 2801 Holdings LLC, Edens Gardens LLC, Adar Associates LLC, Jene's Retirement Living, Inc., and Jene's Retirement Investors Ltd.

The Business Entities include the entities that operate the four SNFs and seven ALFs as well as the entities that own the real estate the SNFs and ALFs are located on. Phillip Esformes has varying equity ownership positions in the various Business Entities, most of which are less the fifty percent. A chart setting forth the operating entities and property holding entities for the At-Risk Facilities, which includes the details of all of the varying equity positions of their owners, is attached as Exhibit "A".

and seven ALFs will be collectively referred to as the "At-Risk Facilities". In support thereof, Movants state:

### I. Introduction

In one thing, at least, the government and Philip Esformes ("Esformes") are allied: both are – or should be – committed to preserving the maximum possible value of the At-Risk Facilities. The government, in anticipation of the conviction it believes it will achieve in this matter, should want the At-Risk Facilities to be as valuable as possible come the day the government may ultimately obtain a conviction and order of forfeiture with respect to Esformes' interests in these facilities and sells them. Esformes, in anticipation of the acquittal he believes he will achieve, wants the value of his life's work preserved against the day he can finally reclaim it. The uncharged other equity owners do not want to have their presently valuable holdings become collateral damage in this dispute.

But an irrepressible cascade of events – initially set in motion by the indictment of Esformes – imminently threatens to deplete the going concern value of the At-Risk Facilities, if they cannot be immediately sold and converted into cash. For example, the Centers for Medicare and Medicaid Services ("CMS") has dramatically reduced the Medicare percentages permitted for reimbursement to the At-Risk Facilities. CMS has also canceled the Medicare provider agreement with Oceanside. And the Florida Agency for Health Care Administration ("AHCA") has denied Mercy's application for a renewal of its license. In this motion, Esformes and the At-Risk Facilities themselves ask the Court to take notice of these dire circumstances and their certain progression, and to order approving the process described in detail below to effect a prompt and timely interlocutory sale to preserve the rapidly diminishing value of these assets.

## II.     Factual background

Each of the At-Risk Facilities has two groups of owners – those who own the real property where the At-Risk Facilities operate their business and provide care to the many hundreds of frail elderly residents,, and those who own the business operations of the At-Risk Facilities. Phillip Esformes is a significant – but almost entirely only a minority – owner of all those entities. "Exhibit A" sets forth in detail the equity interests in the property entities (the so called "Propcos") as well as the equity interests in the operating entities (the so called "Opcos"). Other than Phillip Esformes, no one with any interest in any Propco or Opco is charged with any crime. None of the entities themselves are charged with any crime, despite being subject to government restraint.

Skilled nursing facilities ("SNFs") such as Oceanside, Mercy, Fair Havens, and Harmony, and assisted living facilities ("ALFs") such as Courtyard Manor, Flamingo, La Serena, South Hialeah Manor, Lauderhill, Eden Gardens, and North Miami Retirement Living, are valuable operations, as they have the potential if they are managed well to generate substantial net income – so long as they are going concerns. As mere real property, however, their value is typically orders of magnitude less, especially because single purpose-built SNFs and ALFs aren't easily adapted to other uses.

All elder care facilities are highly regulated by both the United States and the State of Florida. Without the necessary approvals at all levels of government, the SNFs are not eligible to receive the Medicare or Medicaid monies that fund a large part of their operations. Without the proper licenses, SNFs and ALFs obviously cannot operate at all.

Almost immediately after the indictment in this matter was handed down, CMS – the federal agency primarily charged with regulation of elder care facilities – began taking action against facilities associated in any way with Phillip Esformes. Payments of Medicare funds through CMS were substantially curtailed, then increased, then curtailed again, seemingly at random and always without explanation. Over the months, counsel for the At-Risk Facilities has expended tremendous effort to rationalize and stabilize the financial impact of these capricious regulatory actions.[2] Then, on December 20, 2016, CMS dropped the axe on one of the At-Risk Facilities, Oceanside Extended Care ("Oceanside"), by cancelling Oceanside's Medicare provider agreement. A copy of this letter is attached as Exhibit "B". That meant that Oceanside was no longer eligible to receive Medicare funds. Without those funds, Oceanside had to close and relocate all of its patients.[3]

Now, CMS's action against Oceanside has triggered a veritable avalanche of events that signals the inevitable and imminent collapse of the rest of the At-Risk Facilities which are the subject of this Motion. This is so because, under Florida law, the Agency for Health Care Administration (AHCA)[4] is now required to deny license renewal to any facility where any person holding more than a five percent interest in Oceanside also holds more than a five percent interest.[5] As a result, The Nursing Center at Mercy ("Mercy"), on 23 February, received ACHA's "Notice of Intent to Deny." A copy is attached as Exhibit "C". Without a state nursing

---

[2] Indeed, many of the Business Entities intervened in the related civil suit before Judge Williams and filed a Motion for an Order to Show Cause or for an Injunction Under the All Writs Act (DE 64)—an extraordinary remedy—seeking to rein in CMS' behavior.

[3] There are many other business problems to deal with that are expensive and potentially not solvable without a sale. For example, the decertification of Oceanside by CMS has triggered a default by Oceanside's mortgagee. This same mortgagee is a lender to other of the At-Risk Facilities. And Oceanside no longer has any income with which to pay the lender.

[4] The state agency which regulates and manages distribution of Medicaid funds.

[5] Exhibit A illustrates these overlapping minimum ownership interests.

4

home license, Mercy will have to shut down. It is only a matter of time – and not much time at that – before the rest of the At-Risk Facilities receive similar ACHA notices and face the same fate.

While all of this has been going on, the At-Risk Facilities have been trying in vain to encourage the government to agree to a seemingly obvious solution for a seemingly obvious problem: While these At-Risk Facilities will soon be worth very little, they are now worth quite a lot, so the time to sell them is now. Indeed, they are worth enough – even with their current regulatory difficulties, but only so long as they remain open – that the facility owners have received numerous unsolicited inquiries from interested buyers. (As has, Movants are advised, the government.) The owners have kept the government apprised of the fact of these inquiries[6] and have attempted to secure the government's cooperation to allow these inquires to develop and, possibly, bear fruit – the ultimate goal being to sell the At-Risk Facilities while they still have real value, so that the funds can be secured regardless of the outcome of the criminal case.

The At-Risk Facilities, for months, have had telephone conferences and exchanged letters with the government about the sale issues. The At-Risk Facilities have made a very detailed proposal to the government concerning a sale, which is as follows:

- If any person presents an offer to purchase all or any portion of the At-Risk Facilities before any further action by the seller, seller will share with the government information that will include the names of any potential buyers, the amounts of any of their offers, and the financials of the entities that have been provided to such potential buyers.

- The government will expeditiously present any objections to the buyer.

- Once the government approves a buyer or buyers, the government will have a period of time in which to approve the price offered by any buyer who offers the highest price for the At-Risk Facilities or to submit a counteroffer.

---

[6] The government has been apprised, too, of the amounts presently being offered, but the movants think it wise not to include those offers in a public pleading. Of course, they stand ready to inform the Court of the current offer amounts at the Court's request.

5

- If and when a government-approved sale occurs, the government will receive that percentage of the proceeds (after expenses of sale and any liens are satisfied) that coincides with Phil Esformes' ownership interest in that entity prior to his indictment, at the time his assets were frozen. The government will hold those funds in escrow in an interest-bearing account until the criminal case is resolved. The remaining proceeds would be distributed among the other equity owners based on their percentage ownership.[7]

- The government, Esformes, and the At-Risk Facilities, after coming to agreement would present the proposed sale procedures to this Court for approval.

So far, the government has, in essence, ignored the At-Risk Facilities and simply refused to cooperate in moving forward with the sales process.[8] But with "economic death sentences" like the ACHA Notice to Mercy now on the near horizon for the rest of the At-Risk Facilities, a failure to act quickly will mean that tremendous value will be lost to whoever it is – Esformes or the United States – might otherwise ultimately have received it. Even more problematic, a failure to act – or more accurately, a refusal to act – to sell these properties would amount to an intentional governmental depreciation of assets belonging mostly to innocent owners. That is an untenable position.

Selling the At-Risk Facilities soon will not only maximize their value, it will also have the laudable goal of permitting the facilities to continue to provide care to their patients. This

---

[7] Phil Esformes' assets, including his interests in the Business Entities, are without question restrained by the Court. The government has also filed lis pendens against certain of the real property owned by the Business Entities. But the equity positions of the owners (other than Phil Esformes) in the Business Entities are not restrained by this Court.

[8] Driving the At-Risk Facilities out of business is sadly consistent with what the government has apparently been trying to do from the outset. For example, the government convinced Judge Williams to enter an all-encompassing Ex-Parte TRO in the related civil suit restraining all of the bank accounts of many of the SNFs and ALFs, including those of the At-Risk Facilities (DE 11). This would have put the facilities out of business in very short order and caused them to have to relocate hundreds of patients. The facilities intervened in that the case immediately and filed an Emergency Motion to Dissolve the TRO (DE 14). Judge Williams conducted a hearing that same day and entered an Order the next day carving out the bank accounts of the facilities so they could operate and so that the patients could continue to receive care. This Court also entered a similar Order the very next day modifying its Ex Parte Restraining Order (DE 41).

6

will prevent the catastrophic consequence of having to relocate over a thousand patients and could even prevent loss of life of patients due to transfer trauma. In short, everyone would benefit by a quick sale of the At-Risk Facilities and everyone would be harmed if the At-Risk Facilities are left to close their doors.

### III.    Argument

In a forfeiture action, property may be subjected to an interlocutory sale "[i]f [that] property . . . is perishable, or liable to deterioration, decay, or injury. . ." *United States v. Esposito*, 970 F.2d 1156, 1160 (2d Cir. 1992); *see also United States v. King*, 2010 U.S. Dist. LEXIS 123668, 2010 WL 4739791, at *1 (S.D.N.Y. Nov. 12, 2010). It is uncontested that the value of the At-Risk facilities diminishes dramatically by the day. The government's position has supposedly been that a protective order is required "**to preserve for forfeiture, the availability of property** identified in the forfeiture allegations of the Second Superseding Indictment (DE 200), upon conviction of the defendant." (DE 202) (emphasis supplied).[9] Refusing to sell the At-Risk facilities is antithetical to that priority because their value will plummet, rendering them virtually *unavailable* for forfeiture "because an asset worth nothing cannot be said to be 'available.'" *United States v. Dream*, 2013 U.S. Dist. LEXIS 152840 at *14 (E.D. Ken. October 24, 2013).

Movants have standing to raise this motion. Esformes has standing because his ownership interest in the various Business Entities and the At-Risk Facilities is subject to imminent injury, and he has a right to preserve that interest in the event of an acquittal. The Business Entities have standing because the uncharged owners and operators have an actual, valuable interest in the At-

---

[9] The government's refusal to agree to a sale is even more unbelievable when juxtaposed with its own stated intent: "In this case, the United States seeks to preserve the status quo of the property identified in the Second Superseding Indictment by preventing the alienation and **dissipation of the property subject to forfeiture**." (DE 202) (emphasis supplied).

7

Risk Facilities, untouched by the Second Superseding Indictment and unsought by the government, which they too have the right to seek to preserve. The Court has the inherent authority to protect and enforce its own orders, and has the authority by various rules, statutes, and case precedent to order an interlocutory sale even over objection. Movants have put forth a detailed sale proposal that relies on government approval and works to protect the best interest of all interested parties. Movants suggest escrowing those portions of the proceeds related to Esformes pending the outcome of his case, while distributing the innocent owners' proceeds according to their interest.

### A. Movants Have Standing to Bring this Motion

It is axiomatic that Phil Esformes, as a defendant in this criminal case, has standing to seek to preserve the value of restrained assets that he has an interest in pending the resolution of the criminal case.

Non-parties like the Business Entities, already Intervenors in the related civil case, can also have standing to move the court in a criminal case to order an interlocutory sale when their interests in the property are sufficiently threatened by injury. *See United States v. Hyde*, 287 F. Supp. 2d 1095, 1097 (N.D. Cal. 2003). While the statutory and rule-based framework does not explicitly set out a procedure pursuant to which third parties can raise issues in connection with the interlocutory sale of property, neither does it *preclude* a third party from being heard. *See Hyde*; *United States v. King*, 2010 LEXIS 123668 at *11 (SDNY 2010). Indeed, those asserting an interest in property potentially subject to forfeiture are entitled to be heard on the specific issue of the sale of the property. *United States v. Maye*, 2011 U.S. Dist. LEXIS 67937 at *5 (W.D.N.Y. June 24, 2011). Here, Movants own the At-Risk Facilities and are at risk of imminent injury to their property interests if an interlocutory sale is denied.

*United States v. Hyde* is instructive. In *Hyde*, the defendant was charged with various counts of healthcare fraud as well as money laundering. 287 F. Supp. 2d at 1096. The indictment sought forfeiture of certain property, including a beach house. *Id.* The beach house was owned in party by the defendant and in part by defendant's wife, daughter, and daughter-in-law. *Id.* The innocent owners moved as third party claimants for an interlocutory sale of the beach house due to problems causing a rapid decrease in the beach house's value. *Id.* at 1097. The innocent owners sought essentially to trade one property for another, even transferring the government's *lis pendens* to the new property, in order to preserve the value pending the outcome of the criminal case. *Id.* While the government in *Hyde* asserted that the third party claimants lacked standing to move for the interlocutory sale, the court disagreed, citing *United States v. Scardino*, 956 F. Supp. 774 (N.D. Ill. 1996) and stating "... [i]t is possible that under the multi-factor Due Process balancing test applied by the Ninth Circuit in *Crozier*[10], Due Process could be violated should the instant motion not be heard on the merits, particularly in view of the effective restraint on alienation ..." *Hyde*, 287 F. Supp. 2d at 1099.

Here, the Business Entities have the same motive as the third parties in *Hyde*: they seek to preserve the value of the assets potentially subject to forfeiture while the assets are still valuable. Like the third parties in *Hyde*, the Business Entities are partially owned by individuals not under indictment and not charged with any crime who have an ownership interest in the Business Entities which is presently threatened. The *Hyde* Court's concern, that due process might be violated should the third party claimants' motion not be heard on the merits, is equally applicable here.

---

[10] *United States v. Crozier*, 777 F.2d 1376, 1382-84 (9th Cir. 1985) ("precluding third parties an opportunity to challenge a post-indictment order restraining the transfer of property violates due process").

9

Indeed, other courts have held that failure to consider the third party claimants' interest in an interlocutory sale would amount to a violation of their right to due process of law. What process is due depends upon the nature of the interest affected, *Haygood v.Younger*, 769 F.2d 1350, 1355 (9th Cir. 1985), and that determination involves balancing the risk of an erroneous deprivation, the state's interest in providing specific procedures and the strength of the individual's interest. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, (1985). Courts have recognized the overriding strength of the individual interest in the restraint of property in which parties other than the defendant have an interest. *See King*, 2010 LEXIS 123668 at *10 ("Permitting the interlocutory sale of unique property without providing a party asserting an interest therein with notice and opportunity to be heard would raise serious due process concerns"). The Business Entities have a valuable interest in these properties, part of which is not subject to restraint or forfeiture, and have standing to move the Court to order a sale of the At-Risk facilities in order to avoid further depreciation in their value.

B.     This Court Has the Authority to Order the Sale of the At-Risk Facilities

The interlocutory sale of assets potentially subject to forfeiture upon conviction of a criminal defendant is governed by both a statutory and rule-based framework, which, read together, create a straightforward set of parameters for when an interlocutory sale should occur. Simpler still, where a preliminary restraining order mandates that assets be maintained without dissipation of their value, as the Restraining Order does in this case (*see* (DE 8)), the Court can always act on its own inherent authority to prevent such dissipation if the value of the asset is at risk. *See SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000). There is likewise substantial case precedent supporting a court-ordered interlocutory sale in cases where the value of the asset is rapidly dissipating and the criminal case is in its early stages. In fact, it is nearly always the

10

*government* seeking an interlocutory sale of a vanishing asset to preserve the value of the asset pending years of litigation; the Department of Justice Manual "A Guide to Interlocutory Sales in Forfeiture Cases" ("DOJ Manual") instructs DOJ attorneys on the myriad ways they should effectuate interlocutory sales as soon as practicable. The application of Fed. R. Crim. P. 32.2, Supplemental Rule G(7), and 21 U.S.C. § 853(e) are discussed in further detail below.

   i.   *Federal Rule of Criminal Procedure 32.2 and Supplemental Rule of Civil Procedure G(7)*

Federal Rule of Criminal Procedure 32.2(b)(7) states "At any time before entry of a final forfeiture order, the court, in accordance with Supplemental Rule G(7) of the Federal Rules of Civil Procedure, may order the interlocutory sale of property alleged to be forfeitable." Fed. R. Crim. P. 32.2(b)(7). Pursuant to Rule G(7), Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Action, "the court may order all or part of the property sold if: (A) the property is perishable or at risk of deterioration, decay, or injury by being detained in custody pending the action . . . or (D) the court finds other good cause." Supp. R. Civ. Pro. G(7)(b)(i)(A)-(D). 21 U.S.C. § 853(e) also authorizes the court to order the interlocutory sale of real property subject to criminal forfeiture to preserve the equity in the property under certain circumstances. *United States v. Gianelli*, 594 F.Supp. 2d 148, 150 (D. Mass. 2009).

While the standards for ordering an interlocutory sale in the Supplemental Rules of Civil Procedure are not absolutely controlling in a criminal case, they provide persuasive guidance to the Court. *See United States v. Dream*, 2013 U.S. Dist. LEXIS 152840 at *11 (E.D. Ken. October 24, 2013) (relying on Supplemental Rule G(7) for guidance). Specifically, the two standards relevant here are "whether the property is perishable or at risk of deterioration, decay,

or injury by being detained in custody [or restrained] pending the action" and "other good cause". Supp. R. Civ. Pro. G(7)(b)(i)(A)-(D).

Courts routinely order interlocutory sales under G(7)(b)(1)(A) when the value of property is at risk. Interlocutory sales in criminal cases are in fact an effective and approved way to preserve assets until a matter is resolved when the value of the asset is at issue. *See, e.g., Hyde* (ordering the sale of the property as its value was falling due to zoning changes); *Dream*, 2013 U.S. Dist. LEXIS at *10 (E.D. Ken. October 24, 2013) (ordering the sale of a horse, Woodland Dream, because "there is a substantial risk that Woodland Dream's value will diminish significantly if she is not sold at this time, thereby rendering her current value, effectively unavailable for forfeiture"); *United States v. Dean*, 835 F. Supp. 1383, 1385-86 (M.D. Fla. 1993) (granting interlocutory sale of restaurant because its value was rapidly depreciating); *United States v. Pelullo*, 178 F.3d 196, 198-99 (3d Cir. 1999) (ordering interlocutory sale over defendant's objection due to equity depletion of the property through taxes and foreclosure). In fact, the DOJ's Internal Manual "A Guide to Interlocutory Sales in Forfeiture Cases" counts preservation of the value of the asset as the paramount consideration in deciding whether to seek an interlocutory sale. DOJ Manual at II-2 ("the primary consideration .. is whether prompt sale is necessary to preserve the value of the property for forfeiture.").

The circumstances of this case meet the critical conditions for an interlocutory sale. The At-Risk Facilities are clearly subject to rapid devaluation due to loss of CMS funding, impending loss of licensure, and other administrative penalties. As in *Hyde*, *Dream* and *Dean*, there is substantial risk that the value of the properties will continue to fall if a sale is not ordered. Further, the DOJ Manual highlights scenarios in which an interlocutory sale is especially appropriate; among those listed are "businesses operating under state or local licenses which may

be revoked" and "property subject to rapid, significant depreciation or loss in equity". *See* DOJ Manual part II – 1. Both of those factors are present here. Not to be underestimated is the human collateral damage; there are numerous actual frail, elderly individuals residing in these facilities receiving full-time, high-quality care, who will have to be moved and will suffer significant trauma from their transfer to other nursing homes if the facilities are forced to close. *See Bracco v. Lackner*, 462 F. Supp. 436 (N.D. Cal. 1978). These factors demonstrate the urgency of the need for an interlocutory sale to preserve the remaining value of the assets.

    *ii.*    *21 U.S.C. § 853*

Section 853 is not directly applicable because it typically addresses assets already deemed forfeitable by court order. However, there is a notable catchall provision, aligned with the spirit of encouraging the preservation of the asset value, that other courts have used for guidance in interlocutory sales.[11] *See, e.g., United States v. Maye*, 2011 U.S. Dist. LEXIS 67937 (W.D.N.Y. June 24, 2011) (in a post-indictment, pre-conviction criminal case, the Court first relied upon Fed. R. Crim. P. 32.2 and Supplemental Rule G(7), then looked to the catchall of Section 853). Section 853(e)(1) gives the court the authority to take "any other action" to preserve the availability of property subject to forfeiture, even before indictment, if, *inter alia*, "failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture."[12] Like the Court's

---

[11] The uniformity of legislative intent in this arena can be seen also in 18 U.S.C. § 981(g)(6), which applies to criminal forfeiture actions where the associated civil forfeiture action has been stayed. That section states that a district court "*shall* enter any order necessary to preserve the value of the property or to protect the rights of lienholders or other persons with an interest in the property while the stay is in effect." *United States v. Real Prop. & Residence Located at 4816 Chaffey Lane*, 699 F.3d 956, 961 (6th Cir. 2012) (quoting 18 U.S.C. 981(g)(6)).

[12] 21 U.S.C. § 853's "bar on intervention" does not apply in cases like this one, where the motion "does not concern the merits of the indictment ... [but] merely seek[s] to substitute another res of equal or greater value ... in order to prevent wasting of the asset ...". *United States v. Hyde*, 287 F.

13

inherent authority to take any action necessary to enforce its orders, this Court should consider the broad authority granted to the Court by various statutory schemes to take actions necessary to preserve the value of at-risk assets and order the sale of the At-Risk Facilities.

### C. The Proposed Sale and Disposition of the Proceeds

If the Court orders a sale over the government's objection, the sale must comply with the provisions of 28 U.S.C. §§ 2001 and 2002.[13] Section 2001(b) permits the properties to be sold by private sale, which the Business Entities request.

The government is seeking to forfeit Esformes' interests in the Business Entities (*see* p. 38-39 of the Second Superseding Indictment) as well as the real property on which the four SNFs at issue are located (*see* p. 35 of Second Superseding Indictment (RP7) Oceanside, (RP9) Harmony, (RP10) Fair Havens, (RP12) Mercy). The government is also seeking to forfeit as Substitute Real Property the real property on which six of the seven ALFs at issue are located (see p.40 of Second Superseding Indictment (SRP1) South Hialeah Manor, (SRP2) North Miami Retirement Living, (SRP3) Flamingo, (SRP4) La Serena, (SRP5) Courtyard Manor, (SRP6) Eden Gardens). Movants agree that the net proceeds from the interlocutory sale should be put in an interest-bearing account held by the U.S. Marshals pending any additional motions of Phil Esformes and the resolution of the criminal case.[14] *See United States v. Esposito*, 970 F.2d 1156,

---

Supp. 2d 1095, 1097 (N.D. Cal. 2003) (granting a third party's motion for interlocutory sale of the potentially-forfeitable asset in a pending criminal case). Movants are not asking the Court in this motion to determine entitlement or ownership rights in any restrained property. Rather, Movants seek only an interlocutory sale to preserve the value of the assets pending the resolution of the criminal case.

[13] It should be noted that if the government agreed to the sale, the terms and conditions of the sale are removed from the statutory requirements and are subject only to the agreement of all interested parties. Agreement would save substantial attorney and judicial time, expense, and labor and is in the best interest of everyone involved.

[14] Esformes and the Business Entities, by seeking the interlocutory sale of the At-Risk Facilities, expressly do not concede that the government will be entitled to any of the proceeds.

14

1160 (2d Cir. 1992) ("The government's right to forfeiture has not been established [and] the government must hold the proceeds of the sale in escrow pending determination of that right."); Supp. Rule G(7)(b)(iv) ("Sale proceeds are a substitute res subject to forfeiture in place of the property that was sold. The proceeds must be held in an interest-bearing account maintained by the United States pending the conclusion of the forfeiture action.").

However, the government is not seeking to forfeit the equity in the operating companies of the Business Entities other than that belonging to Esformes. The proceeds attributable to this equity should be released to the uncharged equity holders after the interlocutory sale. *See United States v. Schwihimmer*, 968 F.2d 1570, 1580 (2d Cir. 1992) (A criminal defendant can only forfeit *his* interest in property and cannot forfeit the interest of a third party).

Finally, beyond the financial interests at stake, there are the interests of the residents of the At-Risk Facilities (there are a combined 1,143 licensed beds for the At-Risk Facilities (not including Oceanside, which is closed)). If the At-Risk Facilities are sold in short order, the new owners will be able to keep them open and operating, and those residents will not be displaced. If, on the other hand, those At-Risk Facilities close, then all the residents are going to be uprooted – with the potential for all of the serious consequences of "transfer trauma" that have previously been presented to this Court and in the related civil suit.

Whatever right the government may have in seeking forfeiture of the property will not be affected by this sale except to assure the value of the property at the conclusion of the criminal case. Likewise, the rights of Phillip Esformes to obtain the return of frozen assets after successfully defending himself at trial will not be affected by any sale now. Similarly the rights of the uncharged Business Entities and their uncharged equity owners will only be potentially enhanced by an interlocutory sale. The government will be not prejudiced in any way by an

interlocutory sale. However, the government, Esformes, and the uncharged equity owners of the Business Entities all stand to lose – and lose *significantly* – if this sale is denied.

## IV. Conclusion

The government, Phillip Esformes, and the many innocent owner Business Entities all have a common interest in preserving the highest possible value for the At-Risk Facilities. An immediate sale of the At-Risk Facilities – while they are still going concerns – would increase by many times the value to be realized from the sale, as compared to a later sale of shuttered, abandoned buildings. Additionally, immediate sale would permit the residents of the At-Risk Facilities to remain in place. The Court can and should order the government, Esformes and the Business Entities to take all steps necessary to sell the four SNFs and seven ALFs at issue forthwith.

## Request For Hearing

Undersigned counsel requests oral argument of thirty minutes. Such oral argument would be helpful to the Court in ruling on the relief requested.

## Rule 7.1. Certification

Undersigned counsel has conferred with counsel for the government, orally and in writing, numerous times over the last several weeks in a good faith attempt to come to agreement on the procedures for a sale of the At-Risk Facilities, and has been unable to come to any agreement.

Dated this __8__ day of March, 2017.

        DEVINE GOODMAN RASCO
        WATTS-FITZGERALD & WELLS, P.A.
        *Attorneys for Business Entities*
        2800 Ponce de Leon Blvd., Suite 1400
        Coral Gables, Florida 33134
        Telephone: 305.374.8200
        Fascimile: 305.374.8208
        Emails: grasco@devinegoodman.com
               rkuntz@devinegoodman.com
               cclarke@devinegoodman.com

By: _/s/ Guy A. Rasco_
        Guy A. Rasco, Esq.
        Florida Bar No.: 727520
        Robert J. Kuntz, Jr., Esq.
        Florida Bar No. 94668
        Caitlin M. Clarke, Esq.
        Florida Bar No.: 106897


And of Counsel:

Harvey M. Tettlebaum Esq.
Brian G. Flood, Esq.
Husch Blackwell, LLP
*Attorneys for Business Entities*
235 East High Street
P.O. Box 1251
Jefferson City, MO 65102-1251
Tel: (573) 761-1107
Email: harvey.tettlebaum@huschblackwell.com
       brian.flood@huschblackwell.com
*Appearing Pro Hac Vice*


Michael S. Pasano, Esq.
mpasano@carltonfields.com
Carlton Fields- Miami Tower
100 S.E. Second Street, Suite 4200
Miami, Florida 33131
Tel. (305) 530-0050; Fax: (305) 530-0055
*Counsel for Philip Esformes*

Case No.: 16-20549-CR-LENARD

Marissel Descalzo, Esq.
Tache, Bronis, Christianson and Descalzo, P.A.
150 S.E. Second Ave., Suite 600
Miami, FL 33131
Tel: 305-537-9565; Fax: 305-537-9567
Email: mdescalzo@tachebronis.com

*Counsel for Philip Esformes*


Roy Black, Esq.
Howard Srebnick, Esq.
Jackie Perczek, Esq.
Black Srebnick Kornspan & Stumpf, P.A.
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel: (305) 371-6421; Fax: (305) 358-2006
Email:  Rblack@royblack.com
        hsrebnick@royblack.com
        jperczek@royblack.com
*Counsel for Philip  Esformes*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this __8__ day of March, 2017, the foregoing document was electronically filed with the Clerk of Court by utilizing the CM/ECF System. I also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel of parties who are not authorized to receive electronically Notices of Electronic Filing.

_____
Guy A. Rasco

Case No.: 16-20549-CR-LENARD

## SERVICE LIST

Alison Whitney Lehr
Susan Torres
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
Tel: (305) 961-9176
Fax: (305) 536-7599
Email: alison.Lehr@usdoj.gov
susan.torres@usdoj.gov

*Counsel for Plaintiff*


Elizabeth Young
U.S. Department of Justice
Civil Division
601 D Street NW Room 9237
Washington, DC 20530
Tel: (202) 532-4311
Email: elizabeth.young@usdoj.gov

**Counsel for Plaintiff**


Samuel Joseph Rabin, Jr.
Samuel J. Rabin
800 Brickell Avenue, Suite 1400
Miami, Florida 33131
Tel. (305) 358-1064
Fax: (305) 372-1644
Email: sjr@miamilawyer.com
*Counsel for Odette Bracha*

Orlando do Campo
Do Campo & Thornton, P.A.
Chase Bank Building
150 S.E. 2nd Avenue, Suite 602
Miami, Florida 33131
Tel: (305) 358-6600
Fax: (305) 358-6601
Email: od@dandtlaw.com
*Counsel for Arnaldo Carmouze*